UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANGELA GIBSON,

              Plaintiff,

-vs-                              Case No.  6:07-cv-1053-Orl-28KRS

WALGREEN CO., ROBERT PERNESKY,
CAROL WHITE, KRISTIN DOLPHEY,

              Defendants.
_____

# ORDER

On February 26, 2008, Plaintiff filed a six-count Amended Complaint (Doc. 55) alleging employment discrimination and retaliation in violation of state and federal laws.  This cause is before the Court on Defendant Walgreen Co.'s Motion for Summary Judgment (Doc. 116).  Plaintiff has filed a memorandum in opposition (Doc. 137) thereto, and the matter is now ripe for adjudication.

## I.  Background

Plaintiff, Angela Gibson, a Caucasian female, was hired by Walgreen Co. ("Walgreens") in December 1996 as an Order Entry and Doctor Call Technician at Walgreens's Orlando, Florida call center.  (Gibson Dep. I at 10-12)[1].  She remained in that position until she became a Customer Service Representative ("CSR") in 1999.  (Id. at 147).

_____

[1]Plaintiff gave two depositions in this action.  The Court will refer to the December 18, 2007 deposition as "Gibson Dep. I" and the June 17, 2008 as "Gibson Dep. II" throughout this Order.

Plaintiff continued as a CSR until August 2004, when she began working as a Direct Member Reimbursement ("DMR") Specialist/Issue Resolver. (Id. at 147-48). Since August 2004, Plaintiff has remained employed with Walgreens as either a DMR Issue Resolver or a Mail Service Issue Resolver.

Plaintiff contends that in August 2004, Walgreens began denying her promotional opportunities because of her race, in retaliation for her complaints of discrimination, or both. At that time, Walgreens posted openings for three Quality Analyst permanent positions. (Id. at 221-22). Plaintiff, however, did not apply for any of these positions because Operations Manager Paul Deler ("Deler") told a group of employees that to be eligible to apply for one of these positions an employee had to have been in his or her current position for a minimum of three months. (Id. at 223-24). As Plaintiff had very recently been promoted to her position as a DMR Specialist, she was ineligible to apply under this requirement. Approximately a week after making this statement, Deler, who is identified as a black male, told two black employees and two white employees, including Plaintiff, that they could apply for positions despite not having been in their current positions for three months. (Id. at 225-32). By this time, however, the posting for which Plaintiff wished to apply had already closed and the positions had been awarded to other persons. Plaintiff complained to her supervisor, Girtha Wilson ("Wilson"), about Deler's "mistreatment" of her, and Wilson told Gibson that she was sorry that it had happened. (Id. at 229). Though at the time Plaintiff did not attribute any racial motive to Deler's actions, she has since come to believe that Deler was motivated her race. (Id. at 230).

In December 2004, Walgreens posted openings for one permanent and three temporary Quality Analyst positions. Plaintiff applied for the permanent position, but it was awarded to Trisha Fagan ("Fagan"), a black female employee whom Plaintiff believed was less qualified than Plaintiff. (Id. at 239, 241). Plaintiff, Avionne Bobo-James ("Bobo-James"), and Cathy Manion were offered the temporary Quality Analyst positions—positions that Plaintiff and Bobo-James declined. (Id. at 239-40). Plaintiff claims that she declined the temporary position because Walgreens would not guarantee her a return to her current position, pay, or hours once the temporary position ended, despite previous assurances to that effect. (Id. at 241-42). Bobo-James declined the position for personal reasons that were not disclosed to Plaintiff. (Id. at 243). Plaintiff alleges that Walgreens's refusal to guarantee her former position if she accepted the temporary job was discriminatory because non-white employees were allowed to take temporary positions and not risk losing their positions or pay. (Gibson Dep. II at 5).

On January 11, 2005, Plaintiff complained to Robert Zimmerman ("Zimmerman"), a corporate executive visiting the Orlando facility, that she felt she was being discriminated against because of her race. (Gibson Dep. I at 279-80). Plaintiff informed Zimmerman that she was more qualified for the permanent Quality Analyst position than Fagan and that Fagan had received the permanent Quality Analyst position because of her race. (Id. at 371). Additionally, Plaintiff told Zimmerman that she believed that Walgreens's refusal to hold her current position for her should she accept the temporary position "smacked of racial discrimination because of the fact that all these other black employees previously and afterwards have all had their positions held for them." (Id. at 371-72). Despite this

allegation, however, Plaintiff admits that she has no personal knowledge of any other employees being guaranteed their positions if they took a temporary position or whether any employee had to take a reduction in pay after a temporary position expired. (Id. at 245-56). After being alerted to Plaintiff's concerns, Zimmerman questioned Human Resources and informed Plaintiff that the position could not be guaranteed because of operational needs. (Id. at 372).

On November 11, 2005, Plaintiff applied for one of four openings for a Clinical Customer Care Group Supervisor ("CCCGS") position that was posted on November 9, 2005. (CCCGS Application, Ex. 18 to Dec. 18, 2007 Gibson Dep.). The requirements for the position included "[o]ne to two years of previous customer service supervisory experience, preferably in a call center environment" and "[p]roficien[cy] with Microsoft products such as Word and Excel." (CCCGS Posting, Ex. 20 to Dec. 18, 2007 Gibson Dep.). In early January 2006, Walgreens selected four candidates for the CCCGS positions—Azeem Beg, Felicia Burnett, Wilson, and Fagan.

After submitting her application, Plaintiff became concerned that she was never contacted for an interview for the CCCGS positions. (Gibson Dep. I at 278-79). Because of this concern, she requested a copy of her application from the Human Resources department to determine why she had not received an interview. (Id.). Plaintiff states in her deposition that she had to request a copy of her application on three separate occasions before Luz Rivera ("Rivera"), a staff recruiter for Walgreens, produced a copy. (Id.). When Plaintiff reviewed the application produced by Rivera, she noticed that it contained markings indicating that she had declined the position, something which Plaintiff vehemently denies

ever doing.  (Id.; CCCGS Application).  Plaintiff contends that not only did she not decline the position but also that she never received an offer to interview.  (Gibson Dep. at 278-80).

When questioned as to why Plaintiff was not given one of the CCCGS positions, Carol White ("White"), the Human Resources Manager, who has been identified as an African-American, stated that Plaintiff's application "was inadvertently misfiled in her personnel file within the Human Resources Department as opposed to being placed in the recruiter's applicant file."  (White Dep. at 72, June 24, 2008).  White testified that she directed Rivera to interview Plaintiff because Human Resources had misplaced the application.  (Id. at 78).  According to White, Rivera then informed her that Plaintiff "did not want an interview after the fact."  (Id.).  Specifically, White stated,  "I just know that Ms. Gibson was not interviewed; I know Ms. Rivera was directed to interview her; and Ms. Rivera indicated that [Plaintiff] did not want to be interviewed."  (White Dep. at 120, Feb. 7, 2008).

Rivera's story differs from White's.  Rivera stated in her deposition that White directed her to locate Plaintiff's application after Plaintiff complained.  (Rivera Dep. at 72).  Rivera claimed, however,  that she located the missing application in the recruiting folder in her office and specifically denied finding Plaintiff's application in the personnel file.  (Id. at 77-78).  After locating Plaintiff's application, Rivera noticed that the "Position Declined" box had been scribbled on and questioned Plaintiff as to whether she had made the mark.  (Id. at 84, 87-88).  According to Rivera, Plaintiff denied making the mark and they then proceeded to set up an interview.  (Id. at 87-88).  In contrast to White's testimony, Rivera stated that not only did Plaintiff not decline an interview but that Rivera conducted the interview herself and Plaintiff's interview "went well."  (Id. at 44, 75).  Despite Plaintiff's interview going "well,"

Rivera found "maybe two or three that were more qualified" than Plaintiff and recommended four—Beg, Burnett, Wilson, and Fagan—to be selected instead of Plaintiff. (Id. at 46). Also, Rivera claimed that Ron Walker, the hiring manager making the decision as to who would ultimately receive the positions, also interviewed Plaintiff. (Id. at 54, 56, 66, 79-80). Rivera does not recall whether Plaintiff was offered the position. (Id. at 41).

On March 1, 2006, Plaintiff applied for a position as a Call Center Reporting Coordinator. This position entails calculation and ranking of call center employees based upon average call-handling times, results, and attendance. The internal job posting listed several minimum requirements, including "[t]wo or more years in data collection, analysis, and presentation experience" and "[e]xcellent proficiency in Microsoft Excel." (Reporting Coordinator Posting, Ex. 23 to Gibson Dep. I). Additionally, the posting stated that a bachelor degree was preferred but not required. (Id.). Walgreens required applicants to submit a writing sample and to take an exam testing their proficiency with Microsoft Excel spreadsheets. (Gibson Dep. I at 302-03).

Ken Barras ("Barras"), a white male employed as the General Manager of the Orlando Customer Care Center, made the decision to offer the Call Center Reporting Coordinator position to Frank Chapman ("Chapman"), a black male, based on Chapman's demonstrated "strong Excel program proficiency"[2] and Chapman's five years of previous work experience "in a position involving analytical skills." (Defs.' Verified Am. Resp. to Pl.'s Interrogs., Attach. to Doc. 116, at 5-6; Rivera Dep. at 101). Additionally, Chapman possessed a Bachelor of

---

[2]On Chapman's application, a handwritten note next to the "Position Accepted" line states "good test." (Chapman Application, Ex. 22 to Gibson Dep. I).

Arts degree, "further highlight[ing] his analytical and educational qualifications." (Defs.' Verified Am. Resp. to Pl.'s Interrogs. at 5-6). At the time Chapman received the position, no one discussed Plaintiff's test results with her or informed her that Walgreens had determined that she did not possess the necessary proficiency with Excel. (Id. at 5-6; Gibson Dep. I at 305). Though Plaintiff does not know how either she or Chapman performed on the tests, she stated that "I feel extremely certain that I did better than he did."[3] (Gibson Dep. I at 303).

Plaintiff next applied for a position as an Account Coordinator in April 2006. (Account Coordinator Application, Ex. 26 to Gibson December 18, 2007 Dep.). The Account Coordinator position deals directly with client officers, directors, and managers, as opposed to the employees who are covered by Walgreens's pharmacy benefit plan. Kristen Dolphy ("Dolphy"), a Caucasian female, interviewed five applicants and narrowed her selection down to two individuals—Plaintiff and Jennifer Moses ("Moses"), who is identified as being Asian or Pacific Islander. (Defs.' Verified Am. Resp. to Pl.'s Interrogs. at 6). Dolphy selected Moses for the position purportedly due to Moses's "prior experience in a professional office setting and dealing with higher level management."[4] (Id.).

On April 28, 2006, Plaintiff complained to Robert Pernesky ("Pernesky")—a Human Resources Specialist for Walgreens—about racial discrimination at Walgreens and she sent a follow-up letter to Pernesky on May 1, 2006. (Gibson Dep. I at 372). In this letter, Plaintiff

---

[3]When questioned if she remembered how she performed on the test, Plaintiff responded, "I must have done well. I have not seen a copy of it. No one produced it for me, and I did see his test, and I can tell you he did not do that well on it." (Gibson Dep. I at 302).

[4]In her July 17, 2008 deposition, Plaintiff confirmed that she did not feel that she had been treated differently than Asian employees. (Gibson Dep. II at 12).

stated that she had "become a constant victim of racial discrimination." (Pernesky Letter, Ex. 21 to Gibson Dep. I). Plaintiff expressed that she had experienced racial discrimination because she had not received the promotions for which she had applied. (Id.). Regarding the CCCGS position, Plaintiff averred that Wilson and Burnett were "two hard working and dedicated employees" and that she had "nothing but admiration and respect for the decision to give them these positions." (Id.). However, she questioned whether Beg or Fagan were qualified for the positions that they received. (Id.). Addressing the Reporting Coordinator position that was ultimately awarded to Chapman, Plaintiff's letter stated that she was told that "it was a tough decision but that they choose [sic] another candidate." (Id.). Finally, Plaintiff addressed the Account Coordinator position awarded to Moses. Plaintiff claims in her letter that "this is probably the biggest insult against me yet" because Moses had a "bad attendance" record, had "a very bad attitude," and had "only been with the company since August of 2004." (Id.). Plaintiff also questioned whether Moses received the promotion because of nepotism as she is the sister-in-law of an account coordinator employed at Walgreens at that time. (Id.). Plaintiff then complained that, "I have to wonder if to advance with this company I need to be a different color and related to someone" and, "[I]t appears that the criteria for advancement have become something that I can never be. That is a different color." (Id.).

After Pernesky received the letter, he informed White at HR of Plaintiff's claims of discrimination. (White Dep. at 130-31). White claims that she then sent copies of the letter to Mark Wattly of Walgreens's Employee Relations Department and Randy Cuti ("Cuti"), the Loss Prevention Manager. (Id. at 131-32). Cuti, however, states that he does not remember

seeing the letter prior to his deposition on May 22, 2008. (Cuti Dep. at 40). Despite his protestations of not receiving a copy of the letter, Cuti acknowledges that he met with Plaintiff in May 2006 but claims that Plaintiff never discussed racial discrimination at Walgreens during this meeting. (Id. at 41-42). Cuti asserts that instead, Plaintiff discussed her belief that her application for the November 2005 position had been tampered with and questioned why she was not being promoted. (Id. at 42-47). Plaintiff, however, claims that she explicitly discussed complaints of discrimination and retaliation with Cuti at that meeting. (Gibson II Dep. at 80). Cuti avers that he ended the conversation by agreeing to contact Barbara Dunlap ("Dunlap")—a contact for employee relations at the call center—and requesting that she meet with Plaintiff to discuss her concerns. (Cuti Dep. at 48-49). After approximately one month passed after her meeting with Pernesky without Plaintiff hearing from Dunlap, Plaintiff contacted Dunlap. However, after Plaintiff spoke with Dunlap over the phone, she "no longer attempted to seek her help" after Dunlap was "extremely nasty" to her. (Gibson Dep. II at 132).

Without the benefit of legal counsel, Plaintiff filed her first complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 19, 2006, alleging that the earliest date of discrimination was November 1, 2005. (Ex. G to Doc. 137). In her charge of discrimination, Plaintiff noted:

> In November, 2005 I applied for [a] promotion to Clinical Supervisor. The Respondent promoted a significantly less qualified Black Individual (Trisha Fagen) [sic]. In or about February, 2006, I applied for promotion to Reporting Clerk. A Black male was selected. On April 12, 2006, I applied for promotion

to Account Coordinator. A significantly less qualified Black [sic][5] individual, Jennifer Moses, was selected.

(Id.). Plaintiff then added:

> No reason was given to me in November, 2005 for why I was passed over for promotion. The reason given to me in February, 2006 for my being passed over for promotion was that the selectee had previous experience in a similar position and was going to school for something similar. No reason was given for my being passed over for promotion in April, 2006.

(Id.). Shortly thereafter, on August 2, 2006, Plaintiff's counsel wrote a letter to Laura Stubblefield, the EEOC investigator assigned to the case, informing her that he had "recently been retained by [Plaintiff] to represent her in pursing [sic] her discrimination claims against his [sic] employer, Walgreens." (Ex. 1 to Gibson Dep. I at 1). Additionally, counsel stated that it was his opinion that Plaintiff "was discriminated against because of her race" and that this discrimination "has been ongoing since at least November, 2005." (Id.). Notably, neither Plaintiff nor her retained legal counsel included any acts of retaliation in her first complaint to the EEOC.

In September 2006, Plaintiff applied for an Account Coordinator position and received a letter of recommendation for the position from Barras. (Gibson Dep. I at 190-91). Plaintiff withdrew her application for the position, however, after learning that the position had been moved to Tampa, Florida. (Id. at 344). Plaintiff next applied for a position as a Resolution Center Quality Analyst in February 2007, but the position was given to Anita Webb ("Webb"), a black female. (Id. at 329). Although Plaintiff knows nothing about Webb's qualifications

---

[5]Plaintiff mistakenly alleges that Jennifer Moses—an Asian or Pacific Islander—is "Black" in her initial EEOC complaint.

except that Plaintiff had more seniority with Walgreens, Plaintiff believes that she is more qualified than Webb. (Id.). At about the same time, Plaintiff also applied for a position as an Account Coordinator. (Id. at 337). Though Plaintiff admitted in her deposition to not knowing who received this position, she stated that she is more qualified than the unidentified recipient because she knew "without a doubt that [she was] the best choice that [Walgreens] could possibly make in any situation." (Id. at 339-40).

A right-to-sue letter was issued to Plaintiff on January 11, 2007, and Plaintiff filed the instant action on April 13, 2007 in Florida circuit court. Plaintiff then interviewed for another Account Coordinator position in early May, but she was not selected and does not know who was selected. (Id. at 346-54).

On May 16, 2007, Yvonne Byrdshall ("Byrdshall"), a Human Resources employee, met with Plaintiff and discovered that Plaintiff was in possession of pictures of fellow employees gleaned from the company's personnel directory without permission of the IT department. (Investigation Notes, Ex. MM to Doc. 137). Byrdshall requested that Plaintiff leave the information with the Human Resources department and informed Cynthia Humphries ("Humphries"), the Human Resources Manager. (Id. at 3). Humphries requested that Cuti investigate the matter. (Id.). After meeting with Ethan Rigsby, the IT Systems Manager, to review Plaintiff's company emails, Cuti discovered that Plaintiff had sent "numerous" emails of a personal nature to her home email account. (Id.). Cuti interviewed Plaintiff about these printouts and emails, and Plaintiff explained that she had recently interviewed for a promotion and wanted to impress the interviewers at the second round by presenting them with a new personnel directory. (Id.). Plaintiff acknowledged that she sent

the information to her personal email account so that she could work on the directory at home.  (Cuti Dep. at 58).

Humphries and Cuti suspended Plaintiff on May 17, 2007 for "gross misconduct and unprofessional behavior" pending the completion of their investigation.  (Ex. 6 to Cuti Dep.).  On May 22, 2007, Plaintiff served a "registered agent" of Walgreens with a copy of the Complaint previously filed on April 13, 2007.  (Doc. 137 at 21).  Two days later, Roberto Lee ("Lee"), a Senior Human Resources Generalist at Walgreens, issued Plaintiff a Step III Final Written Warning on May 24, 2007 for unprofessional behavior and a violation of the company's Computer Usage Policy, allowing Plaintiff to return to work the next day.  (Ex. 6 to Cuti Dep.).  Plaintiff provides no evidence that Lee had knowledge of service of Plaintiff's Complaint two days earlier when he issued the Step III grievance on May 24.

Plaintiff filed a second charge of discrimination with the EEOC on July 9, 2007, alleging discrimination based upon Plaintiff's race and color and retaliation for prior complaints of discrimination.  (Ex. 34 to Gibson Dep.).  In this second charge, Plaintiff alleged that she was subjected to racial discrimination when Walgreens denied her an unidentified promotion in May 2007.  (Id.).  Plaintiff claimed that Walgreens retaliated against her for her previous complaints of discrimination by "illegally suspending" her for two days and by issuing the Step III Final Written Warning.  (Id.).  Additionally, Plaintiff stated in the second charge that Walgreens changed her work hours "because management did not feel that she could be trusted" and that her supervisor created a hostile work environment when the supervisor "screamed at her" to return at 8:00 a.m. after Plaintiff had entered the building at 7:45 a.m.  (Id.).  White testified that Plaintiff's hours were changed due to business needs

related to call volumes, that the change had nothing to do with her previous suspension, and that she was not the only person to have her schedule changed.  (White Dep., June 24, 2008, at 67-69).

On October 5, 2007, Plaintiff received a Step I written warning for "Failure to Adhere to Phone Management and Ratcheting Policy."[6]  (Ex. JJ to Doc. 137, at 5).  This Step I discipline notes that on September 26, 2007 and October 2, 2007 Plaintiff was observed making personal calls, one of which "lasted for several minutes; the call was of sufficient duration that it prevented [Plaintiff] from taking business calls."  (Id.).  Her group supervisor advised her that "this behavior was unacceptable now that she is a Quality Specialist and takes inbound calls and [that] it was a form of ratcheting."  (Id.).  On June 10, 2008, Plaintiff received a Step II Written Warning for a "Ratcheting Violation."  (Id. at 2).  This discipline states that Plaintiff was "observed around 9:59am on a personal call for about 5 Minutes and then again at 10:15am on another personal call for over 7 Minutes."  (Id.).

Walgreens has now moved for summary judgment on all counts, (Doc. 116), and Plaintiff has filed her response in opposition thereto, (Doc. 137).

_____

[6]Walgreens defines "ratcheting" as:
destructive behavior whereby an employee, in some form manipulates their telephone set causing the phone traffic to be disrupted within the call center. This includes but is not limited to: terminating a call before the conversation has started, or prematurely before the end of the call.  Placing a call on hold and waiting for the caller to hang up.  Leaving your workstation at the end of your shift without placing your telephone on "Logged Out".  Leaving your workstation during your shift and not placing your telephone on an "AUX" code. Leaving your workstation at any time while telephone on "After Call Work" (ACW).  Using the "Drop" button at any time allowing a call to be terminated. *Personal Calls.*
(Ex. JJ to Doc. 137 at 5 (emphasis added)).

## II. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the

outcome of the suit" and must be "such that a reasonable jury could return a verdict for the

nonmoving party." Id. at 248.

## III.  Analysis

In Plaintiff's Amended Complaint, she alleges multiple acts of race discrimination

based on denied promotions between 2004 and the present in violation of Title VII of the Civil

Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII"); the Florida Civil

Rights Act ("FCRA"); and 42 U.S.C. § 1981.  In addition to her failure-to-promote claims,

Plaintiff alleges numerous acts of retaliation against her in violation of Title VII, the FCRA,

and the Florida Whistleblower's Act ("FWA").  The Court addresses these claims in turn.

### A. Discrimination Claims—(Counts I, II, & VI)[7]

---

[7]Count I alleges violations of the FCRA.  Count II alleges violations of Title VII.  Count VI alleges a violation of § 1981.  Plaintiff's § 1981 claim, however, is not clear as to whether Plaintiff is prosecuting a classic pattern or practice theory or whether she is asserting an individual claim of discrimination.  Plaintiff alleges in Count VI that Walgreens "engaged in a pattern or practice of racial discrimination" in violation of § 1981 by "making employment decisions based on race, treating Caucasian employees less favorably than other non-Caucasian employees because of their race, and retaliating against employees who complained of discriminatory practices."  (Am. Compl. ¶ 106).  In support of this claim, Plaintiff attaches three affidavits of fellow Caucasian employees at Walgreens who also allege that they experienced racial discrimination during their employment.  (See Composite Ex. C to Am. Compl.).  Additionally, Plaintiff seeks forms of relief typically only available in class actions, specifically "an injunction ordering Defendants to cease the continued practice causing Constitutional deprivations."  (Am. Compl. at 26).  However, Plaintiff also alleges it was only Plaintiff's Constitutional rights that were violated, (Am. Compl. ¶ 107), and that Walgreens "intentionally engag[ed] in a pattern and practice of race discrimination *against [Plaintiff]*," (Am. Compl. ¶ 108 (emphasis added)).  Because claims seeking to prove discrimination through a pattern-or-practice method are not available to individual plaintiffs, see Davis v. Coca-Cola Bottling Co. Consolidated, 516 F.3d 955, 967-69 (11th Cir. 2008); see also Bacon v. Honda of Am. Mfg., 370 F.3d 565, 575 (6th Cir. 2004) (holding that "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs"), the Court interprets Plaintiff's claim as a claim of individual discrimination in violation of § 1981 and addresses it as such herein.

-15-

Plaintiff claims in her Amended Complaint that Walgreens discriminated against her on the basis of her race in violation of the FCRA, Title VII, and § 1981 by denying her promotions beginning in November 2005.[8]  Because FCRA and Title VII claims of race discrimination are analyzed under the same standards and framework,[9] the Court will address the Title VII claims explicitly with the understanding that the same analysis applies to the FCRA claims as well.

Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).  "On any Title VII claim the plaintiff bears 'the ultimate burden of proving discriminatory treatment by a preponderance of the evidence.'" Crawford v. Carroll, 529 F.3d 961, 975 (11th Cir. 2008) (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir.1990)).  When, as in a case such as this, a plaintiff presents no direct evidence of discrimination, the Court evaluates a plaintiff's circumstantial evidence of race discrimination under the framework established by the U.S. Supreme Court in McDonnell

_____

[8]In this Court's November 16, 2007 Order (Doc. 37), Plaintiff's failure-to-promote claims for the August and December 2004 positions were held to be not actionable because they are time-barred.

[9]The Eleventh Circuit has recognized that Title VII claims and § 1981 claims have the same requirements of proof and invoke the same analytical framework.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Additionally, Florida's courts have stated that "[t]he Florida Civil Rights Act is patterned after Title VII, and therefore federal case law regarding Title VII is applicable" to FCRA claims.  Maldonado v. Publix Supermarkets, 939 So. 2d 290, 293 n.2 (Fla. 4th DCA 2006) (citing Castleberry v. Edward M. Chadbourne, Inc., 810 So. 2d 1028, 1030 n.3 (Fla. 1st DCA 2002)).

Douglas Corp. v. Green, 411 U.S. 792 (1973). Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996).

Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. To establish a prima facie case of race discrimination for failure to promote, a plaintiff must show that: (1) she belongs to a class; (2) she was qualified for, and applied for, the promotion; (3) she was rejected for the promotion despite her qualifications; and (4) another equally or less-qualified employee who is not a member of the plaintiff's class received the promotion. See Adams v. Cobb County Sch. Dist., 242 F. App'x 616, 619 (11th Cir. 2007) (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004)); Shealy v. City of Albany, Ga., 89 F.3d 804, 805 (11th Cir. 1996). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Once the plaintiff has established her prima facie case, the burden then shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. McDonnell Douglas, 411 U.S. at 804. "If the employer meets this burden of production, the presumption of discrimination is eliminated and the plaintiff must then establish that each of the defendant's proffered reasons is pretextual." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). "The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not

what actually motivated its conduct.'" <u>Crawford</u>, 529 F.3d at 976 (quoting <u>Combs v.</u> <u>Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir.1997)).

Plaintiff claims to have been denied a variety of promotions, including promotions to the following positions: (1) CCCGS in November 2005; (2) Call Center Reporting Coordinator in March 2006; (3) Account Coordinator in April 2006; (4) Account Coordinator in September 2006; (5) Resolution Center Quality Analyst in February 2007; (6) PBM Account Coordinator in February 2007; and (7) an Account Coordinator in May 2007.

Regarding the March 2006 Reporting Coordinator position, Walgreens has submitted sworn testimony that Plaintiff lacked the required proficiency with Excel and that Chapman—the individual who received the promotion—was more qualified than Plaintiff. (<u>See</u> Defs.' Verified Am. Resp. to Pl.'s Interrogs. at 5-6). Other than an unsupported assertion that Walgreens administered a "more complex and detailed" test to Plaintiff than Chapman,[10] Plaintiff has provided no evidence establishing that she possessed the requisite proficiency with Excel to qualify her for the position. Additionally, other than Plaintiff's own unsubstantiated belief that she performed better than Chapman on the Excel test, she has presented nothing to establish that Chapman was an equally or less qualified individual. Accordingly, Plaintiff fails to establish a prima facie case for the March 2006 position.

_____

[10]Plaintiff has submitted paper printouts deemed "Chapman Excel Test" (Ex. DD to Doc. 137) and "Gibson Excel Test" (Ex. EE to Doc. 137). These printouts alone are insufficient to establish that Walgreens administered separate tests. Additionally, without knowing what tasks Chapman or Plaintiff were requested to perform in Excel, the Court has no metric by which it can assess whether Plaintiff possessed the requisite proficiency or whether Plaintiff and Chapman were of equal proficiency. Simply put, the Court is unable to grade the answers without being provided the questions.

Plaintiff also fails to present a prima facie case for discrimination regarding the September 2006 position, the two February 2007 positions, and the May 2007 position.[11] Despite receiving a recommendation for promotion from Barras, Plaintiff removed her name from consideration for the September 2006 position after being informed that the position had been relocated to Tampa. (Gibson Dep. I at 343-44). For the Resolution Center Quality Analyst position in February 2007, Plaintiff admits that she has no knowledge of Webb's qualifications and has not provided any evidence that Webb was equally or less qualified for the position than she. (Id. at 333). Similarly, Plaintiff cannot state a prima facie case for the February 2007 Account Coordinator or for the May 2007 Account Coordinator positions because she has no knowledge of, and has presented no evidence as to, who received these positions, their respective qualifications, or their race. (Id. at 339, 353-54).

Walgreens does not claim that Plaintiff failed to establish a prima facie case for the November 2005 and April 2006 positions, instead assuming as much and arguing that "[e]ven if Plaintiff could establish a prima facie case regarding" these two positions, Plaintiff cannot prove that the proffered reasons for the denials were pretextual. (Doc. 116 at 15). For its nondiscriminatory reason for not promoting Plaintiff in November 2005, Walgreens claims that Plaintiff's application had been lost. (See Defs.' Verified Am. Resp. to Pl.'s

_____

[11]The last four positions were not included in the Amended Complaint but have been discussed by Plaintiff in her depositions and raised by Walgreens in its motion for summary judgment. (Doc. 116 at 14-15). In her response to the summary judgment motion, Plaintiff did not respond to Walgreens's assertions that she had failed to establish a prima facie case for the September 2006 position or the two February 2007 positions. In Count I, however, Plaintiff explicitly excluded any state claims of discrimination that were the subject of the second EEOC complaint regarding the May 2007 position yet presumably proceeded with her claim for this position in Count II, her Title VII claim. (Am. Compl. ¶ 66).

Interrogs. at 5).  Walgreens asserts that after Plaintiff inquired why she had not received an interview, it located the missing application and offered Plaintiff an interview but she declined the offer.  (Id.).  However, in light of the conflicting statements previously discussed regarding where Plaintiff's missing application was located, whether Plaintiff was ever interviewed, and whether Plaintiff declined the position, the Court finds that Plaintiff has cast sufficient doubt to permit a reasonable factfinder to conclude that the proffered reason given for the denial of this promotion was pretext for discrimination.  See Arrington v. Cobb County, 139 F.3d 865, 875 (11th Cir. 1998) ("[A] Title VII plaintiff may defeat a motion for summary judgment by undermining the credibility of a defendant's explanation for its actions.").  Thus, as to this promotion, Plaintiff's claims survive summary judgment.

Walgreens's proffered nondiscriminatory reason for not promoting Plaintiff for the April 2006 Account Coordinator position is that Moses was the best applicant for the job, citing her "prior experience in a professional office setting and dealing with higher level management." (Defs.' Verified Am. Resp. to Pl.'s Interrogs. at 6).  Plaintiff claims that Walgreens's reasoning requires this Court to "stretch its imagination—and the truth."  (Doc. 137 at 12). As evidence of pretext, Plaintiff argues that Moses "consistently demonstrated a poor attendance pattern and was even issued a Step II disciplinary action for poor attendance." (Id.).  To support this allegation, Plaintiff has submitted a copy of a disciplinary memo indicating that Moses received a Step I Verbal Warning on February 22, 2005 counseling Moses to improve her attendance and a July 20, 2005 memo indicating that Moses had received a Step II Written Warning for violating Walgreens's attendance policy.  (Ex. II to Doc. 137).  Plaintiff, however, seemingly ignores the September 16, 2005 letter in Moses's

personnel file indicating that this Step II Written Warning had been issued in error due to a miscalculation regarding Moses's hours. (See Moses Memo, Attach. to Doc. 142). The Court finds that the Plaintiff has failed to raise a genuine issue of material fact on the issue of pretext because Plaintiff has produced no evidence of Moses's poor attendance since February 22, 2005—approximately fifteen months prior to the promotional decision.

Accordingly, Plaintiff may proceed with her discriminatory failure-to-promote claims in Counts I, II, and VI regarding the November 2005 position alone. Summary judgment is granted to Walgreens on Counts I and II regarding Plaintiff's claims of discrimination for the remaining positions.

B. Claims of Retaliation—(Counts III, IV, and V)[12]

In her Amended Complaint, Plaintiff alleges that Walgreens subjected her to retaliation in violation of the FCRA, Title VII, and the FWA.[13] In order to establish a prima

---

[12]Count III alleges retaliation in violation of the FCRA, Count IV alleges retaliation in violation of Title VII, and Count V alleges a violation of the FWA.

[13]The FWA prohibits an employer's retaliation against an employee because this employee has "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). Generally, claims brought under the FWA are analyzed under the same framework as Title VII retaliation claims. See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000). The FWA has, however, been interpreted to require that a plaintiff prove that the employer *actually* violated a law, rule, or regulation, *not* that a plaintiff *reasonably believed* that the employer had violated such. See White v. Purdue Pharma, Inc. 369 F. Supp. 2d 1335, 1337 (M.D. Fla. 2005). The Court also notes that Plaintiff has specifically excluded from this count any claims for acts of retaliation arising from her initial EEOC complaint and for filing suit against Walgreens. (Am. Compl. ¶¶ 60, 96). To the extent Plaintiff bases her FWA claim on her claims of discrimination, these claims are limited to the November 2005 position. As the Court has previously determined that Plaintiff may proceed with her discrimination claims only as they relate to the November 2005 position, Plaintiff's FWA claim is similarly limited.

facie case of retaliation, "a plaintiff must show 'that [she] engaged in . . . statutorily protected expression; (2) [she] suffered an adverse employment action; and (3) there is a causal [connection] between the two events.'" <u>Brochu v. City of Riviera Beach</u>, 304 F.3d 1144, 1155 (11th Cir. 2002) (citing <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000)) (alterations in original). "If 'a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant' to produce 'legitimate reasons for the adverse employment action.'" <u>Id.</u> (quoting <u>Johnson</u>, 234 F.3d at 507 n.6). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." <u>Id.</u>

Though the parties contest whether Plaintiff has established the first two prongs of the prima facie case, the Court need not determine these questions because the record reflects that Plaintiff has failed to produce evidence from which a reasonable jury could find a causal connection between her January 2005 complaint to Zimmerman and the subsequent denials of promotions in November 2005, March 2006, and April 2006. Additionally, Plaintiff cannot show that Walgreens's proffered legitimate business reasons for the alleged retaliatory acts taken after service of her Complaint were pretextual.

Walgreens argues that Plaintiff cannot establish a causal connection between her January 2005 complaint of discrimination to Zimmerman and the alleged acts of retaliation in denying her promotions in November 2005, March 2006, and April 2006. (Doc. 116 at 22-23). Plaintiff responds that the "temporal proximity of [her] complaint to Zimmerman and the sabotage of [her] application in November of 2005[] underscores the retaliatory nature of this

adverse employment action" but provides no further evidence in her response tending to

show causation.  (Doc. 137 at 20).  A plaintiff can establish causation by showing a close

temporal proximity between the protected conduct and the resulting adverse employment

action.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).  However,

"mere temporal proximity, without more, must be 'very close.'"  Id. (quoting Clark County Sch.

Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  "A three to four month disparity between the

statutorily protected expression and the adverse employment action is not enough."  Id.

"Thus, in the absence of other evidence tending to show causation, if there is a substantial

delay between the protected expression and the adverse action, the complaint of retaliation

fails as a matter of law."  Id.  Given the approximate eleven-month period between the

complaint to Zimmerman in January 2005 and the first alleged act of retaliation in November

2005, Plaintiff has failed to establish a causal connection regarding her claims that

Walgreens retaliated against her for her complaints to Zimmerman.  See id. (finding that a

period of three months between protected activity and adverse action is insufficient to

establish causal connection).

Regarding the alleged retaliatory actions taken by Walgreens after Plaintiff served her

Complaint,[14] Walgreens states that Plaintiff was disciplined in accordance with company

---

[14]In addition to that discussed in the previous text, Plaintiff alleges a number of other
acts to be retaliatory, including: (1) being yelled at by her supervisor on May 29, 2007; (2)
having her desk moved; (3) being requested to update a doctor's note; (4) not being allowed
to listen to a radio on her desk; (5) not being allowed to wear her "Crocs" shoes; and (6)
being required to find a manager prior to taking family medical leave.  These acts do not
satisfy the second prong of a prima facie case for retaliation that requires a plaintiff to show
that the employer committed a "materially adverse action" that "'well might have dissuaded
a reasonable worker from making or supporting a charge of discrimination.'"  Crawford, 529

rules after she violated company policies and that her schedule was changed due to business needs. (Doc. 116 at 23). The record reflects that Plaintiff was suspended on May 17, 2007 and received a Step III Final Written Warning on May 24, 2007 for violating the company's computer use policy by emailing information taken from Walgreens's personnel files to her home email address without HR's permission. Plaintiff does not dispute that she committed these acts, instead arguing that "[i]n the absence of a well-defined, non-arbitrary punishment policy regarding specific types of policy violations, the gravity of the punishment in relation to the specific action raises questions of material fact." (Doc. 137 at 25).

Walgreens's "Computer Usage Policy"—a copy of which Plaintiff had received and acknowledged understanding—explicitly states that "[u]sers who violate any of the guidelines set forth in this statement may be subject to disciplinary action including written warnings, revocation of access privileges, and termination of employment." (Ex. 10 to Gibson Dep. I). Additionally, Walgreens has produced evidence that other employees who have violated this rule have been given similar, if not more drastic, punishment than that received by Plaintiff. (See Chapman Notice of Termination, Comp. Ex. 4 to White Dep. (terminating Chapman for violating computer use policy); Byrdsell Step III Written Warning, Comp. Ex. 4 to White Dep. (issuing Step III Final Written Warning for violation of computer use policy)). Finally, Plaintiff has produced no evidence that Walgreens failed to discipline an employee known to be violating the company's computer policy. (Gibson Dep. 202-03, 213-14). In light of these

———————————

F.3d at 974 (quoting Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

facts, this Court cannot find that Plaintiff has presented a genuine issue of material fact as to pretext with regard to the issuance of the May 24 Step III Final Written Warning.

Similarly, Plaintiff has not presented a genuine issue of material fact as to pretext regarding Walgreens's proffered legitimate reasons for changing Plaintiff's work hours, issuing the October 5, 2007 Step I Written Warning, or issuing the June 10, 2008 Step II Written Warning.[15] Regarding the change of work hours, White—acting as Walgreens's corporate representative—testified that Plaintiff's hours, as well as those of other employees, were changed due to business reasons because call volume was low during this time. Plaintiff has provided no evidence to rebut this proffered reason. Next, Walgreens claims that the Step I and Step II disciplinary actions were a result of Plaintiff's making personal telephone calls on company time—a violation of the company's ratcheting policy. (See Ex. JJ to Doc. 137). In her response to the motion for summary judgment, Plaintiff has provided no argument or evidence tending to show pretext regarding this proffered reason.[16] Nor does Plaintiff even deny that she made the phone calls for which she was punished. (Gibson II Dep. at 29). Accordingly, the Court finds that Plaintiff has failed to present a genuine issue of material facts regarding pretext.

_____

[15]Though the Court discusses whether Plaintiff has presented a genuine issue of material fact regarding the changing of her schedule, the Court also finds that the change from 6:30 a.m. to 8:00 a.m.—without a reduction in the total number of work hours—does not rise to the level of a "materially adverse action."

[16]The only time that Plaintiff references these disciplinary actions in her response to the motion for summary judgment is in her discussion of whether Plaintiff had suffered an adverse action, a fact that the Court has presumed in reaching this opinion. (See Doc. 137 at 18).

C.  Punitive Damages

In her claims t under the FCRA, Title VII, and § 1981, Plaintiff seeks punitive damages.  Walgreens has moved for summary judgment on this point, arguing that Plaintiff is not entitled to recover punitive damages because she cannot show that the decisionmakers—many of whom she has not identified—acted with the malice or reckless indifference required to enable her to recover punitive damages.  (Doc. 116 at 24). Additionally, Walgreens claims that it can not be found liable because of its good faith efforts to comply with the FCRA, Title VII, and § 1981.  (Id. at 25).

"Recognizing Title VII as an effort to promote prevention as well as remediation, . . . in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 545 (1999).  Material issues of fact remain regarding whether Walgreens acted with malice or reckless indifference to Plaintiff's rights and whether Walgreens engaged in a good-faith effort to comply with the statutes at issue.  Accordingly, Walgreens's motion for summary judgment as to punitive damages is denied.

IV.  Conclusion

In accordance with the foregoing discussion, it is hereby **ORDERED** as followed:

1.  Walgreens's Motion for Summary Judgment (Doc. 116) is **GRANTED IN PART** and **DENIED IN PART**.  Summary Judgment is **GRANTED** as to Counts III, IV, and V in total.  Summary Judgment is **GRANTED** as to Counts I, II, and VI insofar as these counts pertain to positions other than the November 2005 Clinical Customer Care Group Supervisor

position.  Summary Judgment is **DENIED** as to Counts I, II, and VI insofar as these counts pertain to the November 2005 Clinical Customer Care Group Supervisor position and the punitive damages requested therein.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida this 19th day of January, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record